UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **FINCA SANTA ELENA, INC., et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**U.S. ARMY CORPS OF ENGINEERS, et al.,**<br><br>Defendants. | Civil Action No. 11-cv-296 (RLW) |

### MEMORANDUM OPINION

Plaintiffs Finca Santa Elena, Inc. ("Finca"), the Román-Más Foundation, and Angel Román-Más (collectively "Plaintiffs") have sued Defendants U.S. Army Corps of Engineers and its Chief, Lt. Gen. Robert L. Van Antwerp ("Corps"), in connection with the Corps' Rio de la Plata stream stabilization/flood control project ('the Project"). Although the Project covers a seven-mile portion of the Rio de la Plata River, only Phase 1A—the first phase of the project covering the two most downstream miles of the river—has commenced. In their ten-count Complaint, Plaintiffs challenge the entire Project, claiming violations of the Clean Water Act ("CWA"), the National Environmental Policy Act ("NEPA"), and the National Historic Preservation Act ("NHPA").

Defendants' partial motion to dismiss is based on two theories: 1) Counts VIII and X should be dismissed because Plaintiff Finca lacks standing to challenge Phase 1A; and 2) Plaintiffs' claims should be dismissed to the extent they challenge any phase of the Project beyond Phase 1A (referred to in this Opinion as the "Upstream Project Components"). At a status conference with the Court on April 25, 2012, the parties agreed that it was not appropriate

at this time for the Court to rule on whether Plaintiffs have standing with respect to Counts VIII and X. Accordingly, Defendants' Motion as to those two counts has been denied without prejudice. Thus, the only issue before the Court is whether Plaintiffs' claims should be dismissed to the extent those claims challenge the Upstream Project Components. For the following reasons, Defendants' Partial Motion to Dismiss is **GRANTED**.

## FACTUAL SUMMARY

The Rio de la Plata (the "River") is located approximately 11 miles west of San Juan, Puerto Rico. See First Amended Complaint ("FAC") ¶ 1. The Corps has undertaken the Project to address flooding in residential areas located within the River's floodplain. (FAC ¶ 1). The Project includes seven miles of channel modifications to the River, 7.6 miles of levee construction, and the replacement of three bridges. (Id.). Although it was originally proposed as a single-phase project, the Project is now divided into four phases and five construction contracts. (FAC ¶ 63). Currently, only Phase 1A has received funding and has been scheduled for construction. (FAC ¶¶ 2-3).

The "study, design and approval" of the Project has been modified over decades, during which, according to Plaintiffs, there have been "numerous changes" in the Project's scope. (FAC ¶ 5). The Court will not recount the entire complex factual history of the Project, but will note some significant events. Between 1982 and 1988, Congress appropriated funds for a detailed investigation into the Project's scope and potential impacts. (FAC ¶ 68). The Corps issued a Draft Environmental Impact Statement ("DEIS"), which was followed by a Final Environmental Impact Statement ("FEIS") for the Project in September of 1988. (FAC ¶¶ 69-70). The Corps subsequently issued a Record of Decision ("ROD"), finding that the chosen plan was "economically justified and in the public interest" and thereby authorizing the taking of

1,456 acres of property, including property owned by Finca.[1] (FAC ¶¶ 83-84). In 1992, the Corps prepared a Limited Reevaluation Report ("1992 LRR") to update environmental and economic impacts. (FAC ¶ 87). Following authorization from Congress in 1990, the Corps updated the 1988 EIS by conducting an Environmental Assessment ("1993 EA"), and ultimately issued a Finding of No Significant Impact in 1993 ("1993 FONSI"). (FAC ¶¶ 85, 95; Griffith Decl. ¶¶ 13-15).

In 2004, the Corps proposed and approved additional changes to the Project. (FAC ¶ 99). In connection with these changes, the Corps issued a Supplemental Environment Assessment ("2004 SEA"), followed by another FONSI ("2005 FONSI") in 2005. (FAC ¶¶ 101, 108; Scarborough Decl. ¶ 13). In 2008, the Department of Natural and Environmental Resources of Puerto Rico took control of the Project and applied for a Section 404 Clean Water Act permit, which it appears, was approved only as it applied to Phase 1A. (FAC ¶¶ 120-21; Castillo Decl. ¶ 5). The Corps prepared a Supplement to the 2005 FONSI (the "2008 Supplement"), which stated that the Project would be undertaken in four phases. (FAC ¶¶ 136, 142). The Corps issued another FONSI as part of the 2008 Supplement ("2008 FONSI") and the Corps issued a permit authorizing the Puerto Rico DNER to construct the Project. (FAC ¶ 146).

It was not until 2009, when Congress passed the American Recovery and Reinvestment Act of 2009 ("ARRA"), that funding became available for any portion of the Project. (FAC ¶ 148). Only Phase 1A was selected for and approved to receive ARRA funding. (Scarborough Decl. ¶ 15). In October 2009, the Corps resumed oversight and construction responsibility of the Project from the Puerto Rican government. (FAC ¶ 149). In 2010, the Corps awarded a

---

[1] Finca owns the Hacienda Santa Elena, an 18th century sugar mill which is listed on the National Register of Historic Places and is located on the River's Eastern Bank. (FAC ¶ 11). Finca also owns the Santa Elena archaeological site, an adjacent area containing prehistoric artifacts that is also listed on the National Register of Historic Places. (FAC ¶ 12).

construction contract for Phase 1A, and construction is scheduled to be completed by October 2012. (FAC ¶ 65; Scarborough Decl. ¶ 17).

Defendants contend through a number of uncontroverted affidavits that several steps must occur before construction on any of the Upstream Project Components can proceed. Defendants contend that there is currently no funding for the Project other than Phase 1A and that separate Congressional appropriations would need to be made. (Scarborough Decl. ¶ 18). Moreover, there is no guarantee that funds will ever be appropriated for the Upstream Project Components. (Tolle Decl. ¶ 7; Ornella Decl. ¶ 10; Griffith Decl. ¶ 16).

Further administrative and environmental review would also be needed. Based on administration policy, the Corps would be required to update the project evaluation. (Griffith Decl. ¶ 16). According to the Corps, this will involve preparing a Limited Reevaluation Report ("LRR"), which would "assess the current economic viability of the project, update environmental compliance, and validate (or change) the initial investment recommendation." (Id.). Although budget requests have been submitted for the preparation of an LRR, those requests have not been acted upon. (Scarborough Decl. ¶ 19). Until a LRR has been prepared, the future portions of the Project cannot compete for funds. (Id.).

Because the design work for the Upstream Project Components has not been completed, even Phase 1B is not ready for construction. (Scarborough Decl. ¶ 15). Further design work would need to be completed before the Upstream Project Components are implemented. (McCullough Decl. ¶ 10). Further hydrologic modeling would also need to be conducted. (Nelson Decl. ¶ 5). Additional NHPA 106 consultation may also be required and, pursuant to the District Office's Project Management Business Process, the solicitation and contracting process would need to be initiated and concluded. (McCullough Decl. ¶ 10; Tolle Decl. ¶¶ 5, 7).

## ANALYSIS

**A. Parties' Arguments**

Defendants argue that the only portion of the Project that has actually been "funded, finally designed and fully approved" is Phase 1A. (Dkt. No. 18 at 8). Defendants argue that any work upstream of Phase 1A is "a highly uncertain prospect" and whether any of the Upstream Project Components will ever receive funding is "a matter of speculation." (Id. at 8, 13). Moreover, the Upstream Project Components will require "funding, design work, and additional environmental and archeological review," before any may proceed. (Dkt. No. 18 at 23). Because the likelihood of the Upstream Project Components going forward is mere speculation, Defendants contend all claims regarding those portions of the Project are unripe and must be dismissed without prejudice. (Id. at 23, 26).

According to Plaintiffs, the Corps' 2005 FONSI,[2] authorization of river modifications and wetland filling, and finding that the Project would not affect historic properties was the culmination of the Corps' NEPA, CWA and NHPA decision-making for the Project. (Dkt. No. 21 at 1). Plaintiffs argue that the Corps' 2005 FONSI, CWA authorization, and NHPA findings cover and authorize the Corps to proceed with construction of the entire Project and, therefore, Plaintiffs' claims challenging the entire Project are ripe. (Dkt. No. 21 at 6). Plaintiffs further contend that none of the Corps' final agency actions were limited to Phase 1A (or to any individual phase or component of the Project) and the Project must be treated as a whole for purposes of ripeness analysis. (Id.).

---

[2]   Although Plaintiffs did not make entirely clear in their papers which specific FONSI they are challenging, they stated at oral argument that they are challenging the 2005 FONSI. According to Plaintiffs, the 2005 FONSI gives them an immediate right of review to the entire Project. As noted in this opinion, the Corps issued multiple FONSIs, the most recent one having been issued in 2008.

**B. Standard of Review**

The Corps has moved for partial dismissal under Federal Rule of Civil Procedure 12(b)(1). The Corps argues that this Court lacks subject matter jurisdiction to hear any challenges to the Upstream Project Components because those claims are not ripe. Plaintiffs bear the burden of establishing subject matter jurisdiction. See Khadr v. United States, 529 F.3d 1112, 1115 (D.C. Cir. 2008). A defendant may make a factual attack on the Court's subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), as opposed to a facial attack based solely on the complaint. See Macharia v. United States, 334 F.3d 61, 64, 67 (D.C. Cir. 2003). Accordingly:

> When the movant's purpose is to challenge the substance of the jurisdictional allegations, he may use affidavits and other additional matter to support the motion. . . . [There are] a wide array of cases from the four corners of the federal judicial system involving the district court's broad discretion to consider relevant and competent evidence on a motion to dismiss for lack of subject matter jurisdiction to resolve factual issues. . . . [O]nce a factual attack is made on the federal court's subject matter jurisdiction, the district judge is not obliged to accept the plaintiff's allegations as true and may examine the evidence to the contrary and reach his or her own conclusion on the matter.

5B CHARLES ALAN WRIGHT AND ARTHUR MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 1350, 159-198 (3d ed. 2004) (citations and footnotes omitted) (emphasis added).

Before reaching the merits of a claim, the Court must satisfy itself that the dispute "lies within the constitutional and prudential boundaries of the court's jurisdiction." Ctr. for Biological Diversity v. Interior, 563 F.3d 466, 475 (D.C. Cir. 2009) (quoting Util. Air Regulatory Group v. EPA, 320 F.3d 272, 277 (D.C. Cir. 2003)). "Ripeness, while often spoken of as a justiciability doctrine distinct from standing, in fact shares the constitutional requirement of standing that an injury in fact be certainly impending." Nat'l Treasury Emp. Union v. United

States, 101 F.3d 1423, 1427 (D.C. Cir. 1996); see also Wyoming Outdoor Council v. U.S. Forest Service, 165 F.3d 43, 50 (D.C. Cir. 1999) (ripeness doctrine closely associated with standing doctrine).  For a claim to be ripe under Article III, the plaintiff must establish constitutional minima akin to that of standing by showing an injury-in-fact; allegations of possible future injury do not satisfy this requirement.  Wyoming Outdoor Council, 165 F.3d at 48 (citing Whitmore v. Arkansas, 495 U.S. 149, 158 (1990)).  The ripeness doctrine provides the dual purpose of:

> 1) "[conserving] judicial resources for problems that are real and present or imminent by prohibiting their expenditure on problems that are abstract, hypothetical, or remote"; and 2) "[limiting] the ability of courts to intrude excessively on the policymaking domains of the politically accountable Branches by instructing courts to review government actions only when the government's position has crystallized to the point at which a court can identify a relatively discrete dispute."

PIERCE, ADMINISTRATIVE LAW TREATISE § 15.11 at 1334.  Under the ripeness doctrine, this Court may not entertain claims unless they are "constitutionally and prudentially ripe," nor may the Court adjudicate a cause of action to recover for an injury that is not "certainly impending." Wyoming Outdoor Council, 165 F.3d at 48 (quoting Nat'l Treasury Emp. Union, 101 F.3d at 1427).

Even if the "constitutional requisites for Article III standing are present, a party may still lack standing under 'prudential' principles." Wyoming Outdoor Council, 165 F.3d at 48 (citing Gladstone Realtors v. Vill. of Bellwood, 441 U.S. 91, 99-100 (1979)).  The rationale behind the prudential inquiry is to "restrain[] courts from hastily intervening into matters that may best be reviewed at another time or another setting, especially when the uncertain nature of an issue might affect a court's 'ability to decide intelligently.'" Wyoming Outdoor Council, 165 F.3d at 50 (quoting Louisiana Envtl. Action Network v. Browner, 87 F.3d 1379, 1382 (D.C. Cir. 1996)). The Supreme Court has recognized that:

7

> [The] basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also <u>to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties</u>.

Abbott Labs. v. Gardner, 387 U.S. 136, 148-49 (1967) (emphasis added). Premature review of an agency action "denies the agency an opportunity to correct its own mistakes and to apply its expertise." Wyoming Outdoor Council, 165 F.3d at 50 (quoting Ohio Forestry Ass'n Inc. v. Sierra Club, 523 U.S. 726, 735 (1998)). Therefore, a controversy is not prudentially ripe if further administrative processes would aid in the development of any facts needed by the court to decide the question presented. New York State Ophthalmological Soc'y v. Bowen, 854 F.2d 1379, 1386 (D.C. Cir. 1988). Further, a claim is not ripe where the "possibility that further consideration will actually occur before [implementation] is not theoretical, but real." Ohio Forestry, 523 U.S. at 735. "Put simply, the doctrine of prudential ripeness ensures that Article III courts make decisions only when they have to, and then, only once." American Petroleum Inst. v. EPA, 2012 WL 2053572, at *4 (D.C. Cir. June 8, 2012).

In deciding whether a challenge to an agency's decision is prudentially ripe, the court must examine "the fitness of the issues for judicial decision" and the "hardship to the parties of withholding court consideration." Wyoming Outdoor Council, 165 F.3d at 48 (quoting Abbott Labs., 387 U.S. at 149). Accordingly, courts must consider: "1) whether delayed review would cause hardship to the plaintiffs; 2) whether judicial intervention would inappropriately interfere with further administrative action; and 3) whether the courts would benefit from further factual development of the issues presented." Wyoming Outdoor Council, 165 F.3d at 48-49 (quoting Ohio Forestry, 523 U.S. 726, 733 (1998)).

### C. Plaintiffs' Challenge to the Upstream Project Components is Not Prudentially Ripe

Although it is doubtful whether Plaintiffs have met their burden to show that their claims are constitutionally ripe,[3] this Court need not consider that issue because Plaintiffs' challenges to the Upstream Project Components are not prudentially ripe. See Office of Comm'n of United Church of Christ v. F.C.C., 826 F.2d 101, 104 n.2 (D.C. Cir. 1987) (declining to consider constitutional ripeness because claims lacked prudential ripeness); see also Louisiana Envtl. Network, 87 F.3d at 1385; Wyoming Outdoor Council, 165 F.3d at 48 ("the ripeness requirement dictates that courts go beyond constitutional minima and take into account prudential concerns which in some cases may mandate dismissal even if there is not a constitutional bar to the exercise of our jurisdiction."); Full Value Advisors, LLC v. S.E.C., 633 F.3d 1101, 1106 (D.C. Cir. 2011).

Plaintiffs have failed to establish that their challenges to the Upstream Project Components are prudentially ripe. As discussed above, it is uncontested that, among other things: 1) there is currently no funding for any of the Upstream Project Components, nor any guarantee that the Corps will ever receive funding; 2) further administrative and environmental review would need to be completed before the Upstream Project Components could go forward; 3) there has been no funding approved even to perform the additional administrative review; 4) the Upstream Project Components are still in the design phase; and 5) the solicitation and contracting process still needs to be initiated and concluded. Defendants' declarations, moreover, reflect that construction on the Upstream Project Components may never go forward.

---

[3] For example, this Court is not convinced that Plaintiffs have met their burden to show that, as to the Upstream Project Components, the Corps had reached the stage at which its NEPA obligations had matured, that is, the "critical stage of a decision which will result in the irreversible and irretrievable commitment of resources . . . ." Wyoming Outdoor Council, 165 F.3d at 49 (internal citations and quotation marks omitted).

Plaintiffs have failed to controvert or oppose Defendants' declarations in any way. Nor have Plaintiffs asked this Court to allow Plaintiffs to take limited discovery to probe those declarations. Instead, Plaintiffs simply state that, because the Corps issued a 2005 FONSI as to the entire Project, Plaintiffs claims as to the entire Project are ripe.[4]

The fitness requirement of the prudential inquiry "is primarily meant to protect 'the agency's interest in crystallizing its policy before that policy is subjected to judicial review and the court's interests in avoiding unnecessary adjudication and in deciding issues in a concrete setting.'" American Petroleum Inst., 2011 WL 2053572, at *4 (quoting Wyoming Outdoor Council, 165 F.3d at 49). As the Circuit recently held, "[c]ourts decline to review tentative agency positions because doing so severely compromises the interests the ripeness doctrine protects . . . ." Id. (internal quotation marks omitted).

Plaintiffs have failed to show that their challenge to the Upstream Project Components is fit for review. Plaintiffs' challenge is not a pure legal challenge, and (as stated above) Plaintiffs do not contest Defendants' sworn statements that the Corps will likely conduct additional administrative and environmental review. In fact, the history of this case—as documented in Plaintiffs' First Amended Complaint—reflects that the Corps did indeed revisit and modify its NEPA findings on many occasions over the years before Phase 1A even began construction. In fact, there were no less than three FONSIs issued as the Corps continued to reevaluate the Project. At this stage, when it is uncontested that the agency will engage in further administrative review before construction on the Upstream Project Components, judicial

---

[4] As this Circuit has made clear, however, the fact that the agency may have conducted NEPA analysis is not dispositive of whether challenges to those findings are constitutionally and prudentially ripe. See Wyoming Outdoor Council, 165 F.3d at 50 (finding plaintiffs' claims were not ripe even where Forest Service had issued a final EIS and ROD regarding oil and gas leasing program); see also Ctr. for Biological Diversity, 563 F.3d at 480-81.

intervention would inappropriately interfere with the Corps' process. Furthermore, given the steps that the Corps still intends to take with respect to the Upstream Project Components, this Court would benefit from the further factual development of the record. As in both Ohio Forestry and Wyoming Outdoor Council, Defendants have established—and Plaintiffs do not contest—the "possibility that further consideration will occur before [implementation] is not theoretical, but real." Wyoming Outdoor Council, 165 F.3d at 50 (quoting Ohio Forestry, 523 U.S. at 735). Requiring Plaintiffs to wait to challenge the Upstream Project Components until those components actually become a reality and agency review is complete will provide a more final and concrete setting for judicial review.

Given that it is currently unknown whether any of the Upstream Project Components will ever go forward, Plaintiffs have not shown that delayed review would cause them "immediate and significant" hardship. See American Petroleum Inst., 2012 WL 2053572, at *6. There is no imminent threat of injury to Plaintiffs from the Upstream Project Components. Moreover, to the extent that Plaintiffs may claim hardship in being required to bring more than one legal challenge, "the Court has not considered this kind of litigation cost saving sufficient by itself to justify review in a case that would otherwise be unripe." Ohio Forestry, 523 U.S. at 734-35 (rejecting Sierra Club's argument that it would be easier and cheaper to just mount one legal challenge now); see also American Petroleum Inst., 2012 WL 2053572, at *6 ("Considerations of hardship that might result from delaying review will rarely overcome the finality and fitness problems inherent in attempts to review tentative positions.") (internal quotation marks and citations omitted).

Having considered the factors on prudential ripeness, and for the foregoing reasons, this Court finds that Plaintiffs' claims as they relate to the Upstream Project Components are not

prudentially ripe for adjudication.  Defendants' Partial Motion to Dismiss is, therefore, **GRANTED**.  An Order accompanies this Memorandum.


Date:   July 9, 2012

                                                ROBERT L. WILKINS
                                                United States District Judge